# SCANNED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 8/20/10

PRO SE OFFICE

*Haining Zhang*

Case No.10CIV4886
COMPLAINT
AMENTMENT

-against-

Jury Trial:   X  Yes   Q  No
(check one)

AMERICAN ORIENTAL BIOENGINEERING, INC.

SHU JUN LIU, CEO OF AOB

I.     Parties in this complaint:

A.     List your name, address and telephone number.   If you are presently in custody,  include your identification number and the name and address of your current place of confinement.   Do the same for any additional plaintiffs named.   Attach additional sheets of paper as necessary.

Plaintiff        Name    HAINING ZHANG
                 Street Address   RR3 BOX 3087

County, City     MONROE COUNTY, E. STROUDSBURG
State & Zip Code  PENNSYLVANIA 18301
Telephone Number  646-383-0883; 917-7230338

B.     List all defendants.   You should state the full name of the defendant, even if that defendant is a government agency, an organization, a corporation, or an individual. Include the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption.   Attach additional sheets of paper as necessary.

1

*Rev. 05/2010*

Defendant No. 1 Name   AMERICAN ORIENTAL BIOENGINEERING, INC.

    Street Address:   C/O LOEB & LOEB LLP—345 PARK AVENUE

    County, City:   MANHATTAN, NEW YORK

    State & Zip Code:   NEW YORK 10154

    Telephone Number:   212-407-4000; Fax 212-407-4990

Defendant No. 2 Name

    SHU JUN LIU, CEO OF AMERICAN ORIENTAL BIOENGINEERING, INC

    Street Address:   No.485 Nanzhi Road

    County, City:   Daowai District, HARBIN

    State & Zip Code:   Helongjiang, CHINA 150086

    Telephone Number:   011-86-451-8666-6601

Defendant No. 3 Name

    Street Address

    County, City

    State & Zip Code

    Telephone Number

Defendant No. 4 Name

    Street Address

    County, City

    State & Zip Code

    Telephone Number

## II.   Basis for Jurisdiction:

Federal courts are courts of limited jurisdiction. Only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state and the amount in damages is more than $75,000 is a diversity of citizenship case.

A.   What is the basis for federal court jurisdiction?   *(check all that apply)*

    Q   Federal Questions          **QX** Diversity of Citizenship

B.   If the basis for jurisdiction is Federal Question, what federal Constitutional, statutory or treaty right is at issue?

C.   If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party?

    Plaintiff(s) state(s) of citizenship   PENNSYLVANIA, USA

    Defendant(s) state(s) of citizenship   NEW YORK, US & CHINA

### III.   Statement of Claim:

State as briefly as possible the <u>facts</u> of your case.   Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.   Attach additional sheets of paper as necessary.

A.   Where did the events giving rise to your claim(s) occur? MANHATTAN, NEW YORK CITY

B.   What date and approximate time did the events giving rise to your claim(s) occur? July, 2004

C.   Facts:

> **What happened to you?**

1. Defendant violated the obligation to Plaintiff under the advisory/commission agreements dated on March 31, 2003, June 24, 2003 and and July 1, 2003. Plaintiff is claiming $3.16 million for unpaid commission and related compensation.

> **Who did what?**
>
> **Was anyone else involved?**
>
> **Who else saw what happened?**

2. Shujun Liu, has been CEO and President of American Oriental Engineering, Inc. (AKA AOB or AOBO),a Nevada corporation, since 2002. At the present, it trades on NYSE under the ticket symbol of AOB and, prior to July 18, 2005, the symbol had been AOBO.OB, trading on OTCBB. At the end of 2002, Howard Jiang, the former counsel for Defendant, met Plaintiff at some conference and Jiang expressed some of his clients, including Defendant, intend to raise capital in the format of private placement in the U.S. and asked Plaintiff's assistance. Within days, through Jiang's instruction, Clarence Chan ("Chan"), AKA, Tsz King Chan, then VP in finance for Defendant emailed and called me on about raising capital for AOB. At January 20, 2003, through Plaintiff's effort, an amount of $200,000 was raised by selling six hundred thousand (600,000) shares of AOBO held by affiliated shareholders Bai Cao and Shujun Liu to Moshe Y. Rudzinski.

3. Impressed by Plaintiff's performance, Defendant presented Plaintiff a confidentiality agreement on March 15, 2003 and a signed advisory/commission agreement, which was dated on March 31, 2003 and signed on April 4, 2003.by Defendant on April 5, 2003. The advisory agreement is titled as "Commission for Arranging Convertible Debenture and Investment Banking Services." The main points of the engagement are:

  a. A total of 250,000 free warrants, with an exercise price of $0.50  and a term of three years, with a piggy back registration right to be issued to Plaintiff. Among them, 125,000 warrants to be issued upon immediate closing of a financing arranged by Plaintiff and 125,000 following the second tranche;

  b. Defendant would pay Plaintiff a cash amount in eight (8)percent of capital raised;

  c. Plaintiff would have a term of three months of exclusivity since the date of signing.

Actually, from March 31, 2003 on, Chan, Defendant's representative, called and asked Plaintiff numerous times to arrange an equity line of credit for AOB in an amount of $1.25 million. Chan indicated it would be an exclusive relationship, as Chan terms it as "---if your investor can help us to arrange a equity line, we will use them and we will not shop around for another firm who can provide us with such, that means, we will accept your condition in the convertible debenture term sheet that we will not raise any equity line." Chan also indicated advisory compensation in 250,000 warrants will be pro rata to any amount even it is less than US$1.25 million.

4. On June 24, 2003, both Barbell Group, a Panama corporation, and Defendant contacted Plaintiff for a possible deal. On the same day, Clarence Chan, Defendant's representative, emailed Plaintiff an advisory agreement pertinent to the transaction between Defendant and Barbell Group. In the June 24, 2003 agreement, Defendant again promised a total of two hundred fifty thousand (250,000) free warrants with a piggy-back registration right and an exclusive term for three months from the date of signing the agreement, as well as a cash commission of eight (8) percent. On June 25, 2003, Plaintiff arranged a private placement, in a format of equity line of credit, between the Barbell Group and Defendant. Both parties signed the agreement. On June 25, 2003, the documentation for USD$1 million in equity line of credit had been completed and the investor put a capital of USD$ 1 million in escrow account ready for Defendant to draw. According to the investment agreement, the investment period begins on the effective date of the Registration and continues for 12 consecutive months.

5. On July 14, 2003, Defendant Shujun Liu, the CEO of AOB, faxed Plaintiff a modified agreement pertinent to the Barbell/AOB transaction dated on July 1, 2003. In the signed agreement, it stated Haining Zhang the Plaintiff would get a total of 250,000 warrants, 125,000 warrants at closing of an equity line of credit and 125,000 warrants after the first drawdown. Also in the signed agreement, Defendant promised a cash commission of eight (8) percent at the closing of an equity line of credit, no matter whether there is a drawdown. Also, an exclusiveness for three months was included in the signed agreement. The equity line credit for $1 million was closed on June 25, 2003  Defendant owes Plaintiff 125,000 cashless warrants commencing June 25, 2003 for three years and a cash commission of $80,000. The share price was $5.50 on June 25, 2006.

6.    During the period from April 1, 2003 to July 18, 2003, Clarence Chan, Defendant's representative, phoned and emailed Plaintiff numerous times a day to consult for various options regarding raising capital for AOB.

7. However, on July 22, 2003, Defendant filed a 8-K to report entering an equity of line investment agreement, dated on July 18, 2003, with BH Capital Investments, LP and Excalibur Limited Partnership, other than Plaintiff's client, for USD $3 million. After reading the news release, Plaintiff called Defendant's representative for an explanation and Chan indicated AOB just changed the name of  the investor and few other numbers in the investment agreement with Barbell Group and asked Defendant to sign with the new investors, without regard to the fact that Plaintiff had a legally binding agreements (as illustrated in paragraphs 3 and 5) with the Defendant acting as the Defendant's advisor until July 14, 2004 (one year after the signing with a first refusal right) and thus owed a duty of loyalty to plaintiff until that time and the fact that an equity line agreement with Plaintiff's investor client through Plaintiff's commitment on behalf of Defendant had been just signed.

8.    On August 14, 2003, after several requests by Plaintiff, Clarence Chan, the Defendant's representative, emailed Plaintiff to set up a meeting for Plaintiff to meet with Defendant Shujun Liu, CEO of AOB, at 10:00AM on August 20, 2003 at Grand Hyatt Hotel Mid-town

Manhattan in New York during Defendant's business trip in the U.S. Plaintiff arrived at the hotel at 9:45AM on that day and waited until 12:00PM, both Defendant and Dependant's representative Clarence Chan failed to show up.

9. On April 23, 2004, Defendant's representative Clarence Chan asked Plaintiff's assistance in helping another company go public in the U.S. When asked on the warrants on AOB, he tried to discourage Plaintiff to get the warrants by claiming AOB cooked its books and the warrants were not worthy much in value. His original words:" However, I think you properly understand that most of the Chinese Companies, including AOBO, hide almost 2/3 of their profit before they were listed in US (e.g. AOBO, before they were listed in US, their net loss is US$ 833,000 but right after listing their net profit for the subsequent year was US$ 1.2 million).  This is mainly because of they wanted to avoid paying too much value added tax in China, which is almost 17% of the value of goods produced." The emails wee coped to Steve Cao, AOB's market·maker at that time.

10.    On June 14, 2004, Plaintiff faxed Defendant AOB and Defendant Shujun Liu, CEO of AOB, signed commission agreement dated on July 1, 2003 requesting 125,000 warrants as well as the $80,000 cash commission as promised. However, Defendant failed to respond.

11. In August 2004 Plaintiff went to Beijing to meet Defendant Shujun Liu and Lily Li, AKA, Yanchun Li, AOB's CFO, Secretary and Board member, for the purpose of convincing Defendant to issue the warrants and to pay the cash commission. The meeting was held at the lobby of China Grand Hotel Beijing around 8:30pm. During the meeting, Lily Li was on the defensive. While we were at the meeting, Howard Jiang, the former counsel for Defendant, called in and he threatened a counter suit if Plaintiff would ever dear to file a lawsuit to get the warrants issued. At the end, Defendant Shujun Liu rejected to issue Plaintiff the warrants by saying the attorney was telling him the agreement was not valid since it was without a corporate resolution.

12. During the years in 2004 and 2005, Plaintiff contacted Defendant and Clarence Chan, Dependant's representative, numerous times by email and phone calls on the warrants. Both the Defendant and Defendant's representative Clarence Chan failed to respond.

Plaintiff brings forth the following counts and allegations supporting his cause of action:

Defendant's July 18, 2003 deal with BH Capital Investments, LP and Excalibur Limited Partnership breached its obligation to Plaintiff in the agreements signed on March 31, 2003 and July 1, 2003. Furthermore, Defendant's act prohibited Defendant to perform the rest of the obligations defined in the signed July 1 2003 agreement. Plaintiff would be entitled to be compensated by a cash commission of $80,000 and a total of 250,000 cashless warrants if Defendant hadn't breached its duties and Plaintiff were allowed to perform.

The warrant shares should be issued as cashless commencing on June 25, 2003 for three years with an exercise price of a ninety (90) percent of the lowest closing bid during a period of fifteen days prior to an exercise but no less than US$0.50 per share. On June 11, 2003, the closing price was $0.59 and the closing bid was $0.25. On November 14, 2005, the shares were traded at an average price of $7.5 per share with a trading volume over 11 million shares. Therefore, the net number of free trading shares Plaintiff should get from owing the 250,000 cashless warrants is 250,000x($7.5-$0.5)/$7.5=233,333 shares. The shares were traded over $10 per share most of time in 2007 with a heavy volume and it reached at $13.97 on January 18, 2007 with a volume over two million shares. Therefore, Plaintiff should have a cash of $2.33 million at least by selling 233,333 shares, with a potential amount of $3.25 million if 233,333 shares were sold at $13.97 per share on January 18, 2007. Plaintiff claims $2.33 million plus an accrued interest of 6% commencing January 1, 2007.

Plus $ 80K in cash commission should be rewarded on July 1, 2003 and accrued interest since July 1, 2003.

Therefore, Plaintiff is claiming $2.41 million of cash plus accrued interest in reward.

**IV.    Injuries:**

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received.

Plaintiff brings forth the following counts and allegations supporting his cause of action:

### COUNT 1 – CONTRACT BREACH UNJUSTIFIEDLY

Defendant committed a contract breach in whole based upon failure to pay the obligated commission in the written agreements on the performance by Plaintiff on behalf of Defendant in a violation manner leading to the economical as well as opportunity losses sustained by the Plaintiff, who had to turn down other assignments for taking on the Defendant's assignment.

### COUNT 2 – FRAUDULENT DEALING

Defendant's fraudulent behavior had caused a substantial harm to the Plaintiff's professional activities.

### COUNT 3 – BREACH OF FIDUCIARY DUTY

Defendant breached its fiduciary duty to Plaintiff by violating its obligation defined in the signed agreements and in a result denying the potential benefits that Plaintiff would have earned if Defendant hadn't breached its obligations defined by the signed advisory agreements with Plaintiff.

**V.     Relief:**

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking, and the basis for such compensation.

<u>DAMAGES</u>

THEREFORE, Plaintiff seeks damages for unpaid compensation in the amount of $2.41 million, plus accrued interest together with collection expenses, attorney fees and all costs and expenses of this legal action.

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 19th day of August, 2010      .

Signature of Plaintiff

Mailing Address:

*RR3 Box 3087*
*East Stroudsburg PA 18301*

Telephone Number : 917-723-0338, 646-383-0883

Fax Number  *(if you have one)*   *909-740-1855*

<u>Note</u>:    All plaintiffs named in the caption of the complaint must date and sign the complaint.   Prisoners must also provide their inmate numbers, present place of confinement, and address.

<u>For Prisoners:</u>

I declare under penalty of perjury that on this _____ day of _____, 20__, I am delivering this complaint to prison authorities to be mailed to the *Pro Se* Office of the United States District Court for the Southern District of New York.

Signature of Plaintiff:

Inmate Number

8

*Rev. 05/2010*

*Exhibit #1*

# STOCK PURCHASE AGREEMENT

STOCK PURCHASE AGREEMENT, made effective as of this 19th day of December, 2002 by and between **Moshe Y. Rudzinski** ( Purchaser ) and **Liu Shujun** ( Seller ).

## W I T N E S S E T H

WHEREAS, Seller desire to grant rights to the Purchaser, to buy _____ shares of the common stock of American Oriental Bioengineering, Inc. ("Company"), traded on the Over the Counter Electronic Bulletin Board ("OTCBB"), symbol "AOBO"( Share(s)), which have no restrictive legend whatsoever, and restriction whatsoever on re-sale, on the terms and conditions set forth in this Stock Purchase Agreement ( Agreement ); and

WHEREAS, Purchaser desires to buy the Shares on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the promises and respective mutual agreements herein contained, it is agreed by and between the parties hereto as follows:

## ARTICLE 1
## PURCHASE AND SALE OF THE SHARES

1.1 Purchase of the Shares. Subject to the each Minimum Purchase described below, at any time from the date of execution of this Agreement until July 31, 2003 ("Termination Date"), Purchaser shall have the option to purchase from the Seller the Shares in accordance with the purchase rights herein granted by the Seller to the Purchaser. The Shares shall be free from any and all restrictive legends whatsoever and any and all restrictions on re-sale. Each purchase shall have a minimum value of $100,000 based on the Purchase Price, as defined below, except for the last purchase which may be less than $100,000 depending upon the number of Shares remaining and the Purchase Price ("Minimum Purchase"). Purchaser may, at any time through the Termination Date, purchase more than the Minimum Purchase. Purchaser shall exercise its purchase rights by giving written notice of the exercise of its purchase rights ("Notice of Exercise") to the Escrow Agent, as defined in Section 4.1 below, in the form annexed hereto as Exhibit A. The purchase price for each Share shall be 70% of the closing bid price of the Shares as reported on the OTCBB on the date a Notice of Exercise is given to the Escrow Agent ("Purchase Price"). The first Notice of Exercise shall be given on the day prior to the Closing Date. Each subsequent Notice of Exercise may be given at any time prior to the Termination Date. The Purchase Price shall be payable in accordance with the instructions to the Escrow Agent provided in paragraph 4.4.

1.2 Closing Date. The Closing Date shall be ____, January ___, 2003 ("Closing Date"). Each subsequent date on which Shares are purchased shall be a "Subsequent Closing Date" and shall occur on the day following the date on which the Escrow Agent receives a Notice of Exercise and payment of the Purchase Price, as set forth in Section 4.4 below.

1.3 Instruments of Conveyance and Transfer. Upon each Notice of Exercise, the Escrow Agent shall deliver a certificate or certificates representing the Shares to Purchaser, without restrictive legend of any nature whatsoever, in form and substance satisfactory to Purchaser ( Certificates ), as

shall be effective to vest in Purchasers all right, title and interest in and to all of the Shares, as set forth in Article 4 herein, along with an appropriate stock power or stock powers, with a medallion guaranteed signature of the Seller or Seller, sufficient to transfer the Certificate or Certificates into the name of the Purchaser or his designee. The Seller shall provide any and all assurances which the Purchaser requires to assure that the Shares sold are free of any and all restrictions upon re-sale including but not limited to letters from the Company's transfer agent and the Company. If necessary, Seller shall provide an opinion of counsel to verify that the Shares are free of any restriction upon re-sale.

## ARTICLE 2
## REPRESENTATIONS AND COVENANTS OF PURCHASER

2.1     The Purchaser hereby represents and warrants that:

(a)     The Purchaser has the full right, power and authority to enter into this Agreement and to carry out and consummate the transaction contemplated herein. This Agreement constitutes the legal, valid and binding obligation of Purchaser.

(b)     The Purchaser acknowledges that investment in the Shares involves substantial risks and is suitable only for persons of adequate financial means who can bear the economic risk of an investment in the Shares for an indefinite period of time. Purchaser further represents that Purchaser:

(i)     is an Accredited Investor as defined in Regulation D promulgated under the Securities Act of 1933, as amended ("Act");

(ii)    is acquiring the Shares for its own account, for investment purposes only and not with a view toward resale, assignment or distribution thereof, and no other person has a direct or indirect, beneficial interest, in whole or in part, in such Shares;

(iii)   has such knowledge and experience in financial, tax and business matters that it is capable of evaluating the merits and risks of an investment in the Shares;

(iv)    has been given the opportunity to ask question of and to receive answers from persons acting on the Seller' behalf concerning the terms and conditions of this transaction and also has been given the opportunity to obtain any additional information which the Seller possesses or can acquire without unreasonable effort or expense. As a result, Purchaser is cognizant of the financial condition, capitalization, use of proceeds from this financing and the operations and financial condition of the Company, has available full information concerning their affairs and has been able to evaluate the merits and risks of the investment in the Shares; and

(v)     The funds provided for the Purchaser's purchase are either separate property, community property over which the signatory(ies) hereto has or have the right of control or are otherwise funds as to which the undersigned has the sole right of management.

# ARTICLE 3
# REPRESENTATIONS AND WARRANTIES OF THE SELLER

3.1   The Seller represent and warrant to the Purchaser, as of the Closing Date which is the date on which this Agreement is signed, the following:

(a)      Seller shall transfer title, in and to the Shares, to the Purchaser free and clear of any and all restrictive legends whatsoever, all liens, security interests, pledges, encumbrances, charges, restrictions, demands and claims, of any kind and nature whatsoever, whether direct or indirect or contingent.

(b)      Seller is not an "affiliate" of the Company as such term is defined in Regulation D promulgated under the Act, and have not done any act or acquired any status whereby the Shares would become "restricted" as that term is defined in Rule 144 promulgated under Regulation D of the Act.

3.2   If the Seller is a corporation ("Corporate Seller"), the Corporate Seller is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, with full power and authority to own, lease, use and operate their properties and to carry on their business as and where now owned, leased, used, operated and conducted.   The Corporate Seller is duly qualified to conduct business as a foreign corporation and are in good standing in every jurisdiction in which the nature of the business conducted by it makes such qualification necessary, except where such failure would not have a Material Adverse Effect.   A "Material Adverse Effect" means any material adverse effect on the operations, results of operations, properties, assets or condition (financial or otherwise) of the Corporate Seller, or on the transactions contemplated hereby or by the agreements or instruments to be entered into in connection herewith.

3.3   (a)      Each Seller has all requisite corporate power and authority to enter into and perform his, her or its obligations under this Agreement and to consummate the transactions contemplated hereby and thereby and to issue the Shares in accordance with the terms hereof and thereof.

(b)      The execution, delivery and performance by each Seller of this Agreement and the transfer by each Seller of the Shares have been duly and validly authorized and no further consent or authorization of the Seller, or in the case of the Corporate Seller, its Board of Directors or shareholders are required.

(c)      This Agreement has been duly executed and delivered by each Seller.

(d)      This Agreement constitutes, and upon execution and delivery thereof by each Seller, will constitute, a valid and binding agreement of each Seller enforceable against each Seller in accordance with its respective terms.

3.5    The Shares shall be duly and validly issued and outstanding, fully paid and non-assessable, free and clear of any taxes, encumbrances, mortgages, pledges, and liens of any nature whatsoever, and charges with respect to issuance and shall not be subject to preemptive rights or similar rights of any other stockholders of the Company.   Assuming the representations and warranties of the Purchaser herein are true and correct in all material respects, each of the Shares will have been issued in material compliance with all applicable U.S. federal and state securities laws.

6    The execution and delivery by the Seller of this Agreement did not and will not, the sale of or granting of the stock purchase rights by the Seller for the purchase of the Shares did not and will not contravene or constitute a default under or violation of (i) any provision of applicable law or regulation, (ii) the Company incorporation documents and by-laws, (iii) any agreement, judgment, injunction, order, decree or other instrument binding upon any Seller or any Seller's assets, or result in the creation or imposition of any lien on any asset of the Seller.   The Seller are in compliance with and conforms to all statutes, laws, ordinances, rules, regulations, orders, restrictions and all other legal requirements of any domestic or foreign government or any instrumentality thereof having jurisdiction over the conduct of his her or its businesses or the ownership of its properties, except where such failure would not have a Material Adverse Effect.

## ARTICLE 4
## <u>CLOSING, ESCROW AND DELIVERY OF DOCUMENTS</u>

4.1    <u>Appointment of Escrow Agent.</u> The Seller and the Purchaser hereby appoint Novack Burnbaum Crystal LLP, 300 East 42nd Street, New York, New York 10017 to act as Escrow Agent for purposes of this Agreement and the deliveries contemplated by this Agreement. The parties to this Agreement hereby acknowledge that the Escrow Agent also serves as counsel to the Purchaser and will continue to act as counsel to the Purchaser in the event any dispute arises pursuant to this Agreement. Both Purchaser and Seller hereby waive any right to assert that NBC has a conflict of interest with respect to acting both as an Escrow Agent and as counsel to the Purchaser with regard to this Agreement and the transactions contemplated in this Agreement.

4.2    <u>Escrow of Shares.</u>   Prior to the Closing Date, the Seller shall deliver or cause to be delivered to the Escrow Agent an aggregate of _____ Shares of the Company, in the number and the denominations set forth on <u>Schedule A</u>, along with two (2) executed stock powers, signature medallion guaranteed, for *each* Certificate sufficient to transfer full title and interest to the Purchaser as required by the Company's transfer agent ("<u>Stock Powers</u>").   The Escrow Agent shall hold the Shares and shall deliver them or redeliver them to the Purchaser or to the Seller, as applicable, only in accordance with the terms and conditions of this Agreement.

4.3    <u>Holding of Shares.</u>   The Escrow Agent shall hold the Shares in certificated form and the Stock Powers at the office of the Escrow Agent until released in accordance with Section 4.4 below or upon termination of this Agreement, or resignation by the Escrow Agent of its appointment hereunder.

-4-

4.4     Release of Shares.

(a)     Upon the receipt of (i) a Notice of Exercise from the Purchaser stipulating the number of shares of Common Stock it is purchasing on such date, and the Purchase Price per share being paid by the Purchaser under the Notice of Exercise, and (ii) a wire transfer for the Purchase Price of the Shares set forth in the Notice of Exercise, the Escrow Agent shall release from the Escrow Account and transfer to the Purchaser that number of Shares of common stock stipulated in the Notice of Exercise and shall pay to the Seller or pay at the Seller' direction the Purchase Price for the Shares.  If, with regard to any such purchase the number of Shares in a Certificate is required to be split, then the Escrow Agent shall send the Certificate to the Company's transfer agent, along with the requisite Stock Power, and request that the transfer agent split the Certificate into the number of shares purchased, which Certificate shall be issued in the name of the Purchaser, and a Certificate for the balance of the Shares into the name of the Seller, which Seller Certificate shall be re-delivered to the Escrow Agent to be held in escrow until purchased by the Purchaser.  The Escrow Agent shall have irrevocable authority to transfer the Shares to the Purchaser upon the receipt of a Notice of Exercise, provided Escrow Agent receives the accompanying Purchase Price for the Shares.

(b)     The Escrow Agent shall release the Shares upon receipt, at any time, of joint written instructions from the Seller and the Purchaser directing the manner in which the return or other distribution of the Shares is to be made.

(c) The Escrow Agent's obligation under this Agreement shall terminate on the Termination Date unless the Purchaser and any Seller or Seller who have unsold Shares pursuant to this Agreement jointly request in writing that the Escrow Agent continue its appoint hereunder.  Upon the Termination Date, the Escrow Agent shall return any unsold Shares and Stock Powers which it is holding to the Seller or Seller as set forth on Schedule A.

4.5.    Status of the Escrow Agent, Etc.  The Escrow Agent is acting under this Agreement as an escrow agent only.  No term or provision of this Agreement is intended to create, nor shall any such term or provision be deemed to have created, any joint venture, partnership or attorney-client relationship between or among the Escrow Agent, the Seller and the Purchaser.   The Escrow Agent's only duties are those expressly set forth in this Agreement, and each of the Seller and the Purchaser authorizes the Escrow Agent to perform those duties in accordance with its usual practices in holding property of its own or those of other escrows.  The Escrow Agent may exercise or other-wise enforce any of its rights, powers, privileges, remedies and interests under this Agreement and applicable law or perform any of its duties under this Agreement by or through its partners, employees, attorneys, agents or designees.

4.6.    Exculpation.  The Escrow Agent and his designees, and their respective partners, employees, attorneys and agents, shall not incur any liability whatsoever for the disposition of the Shares or the taking of any other action in accordance with the terms and provisions of this Agreement,

for any mistake or error in judgment, for compliance with any applicable law or any attachment, order or other directive of any court or other authority (irrespective of any conflicting term or provision of this Agreement), or for any act or omission of any other person selected with reasonable care and engaged by the Escrow Agent in connection with this Agreement (other than for such Escrow Agent's or such person's own acts or omissions breaching a duty owed to the claimant under this Agreement and amounting to willful misconduct as finally determined pursuant to applicable law by a governmental authority having jurisdiction); and each of the Seller and the Purchaser hereby waive any and all claims and actions whatsoever against the Escrow Agent and its designees, and their respective partners, employees, attorneys and agents, arising out of or related directly or indirectly to any and all of the foregoing acts, omissions and circumstances.  Furthermore, the Escrow Agent and his designees, and their respective partners, employees, attorneys and agents, shall not incur any liability (other than for a person's own acts or omissions breaching a duty owed to the claimant under this Agreement and amounting to willful misconduct as finally determined pursuant to applicable law by a governmental authority having jurisdiction) for other acts and omissions arising out of or related directly or indirectly to this Agreement or the Shares; and each of the Seller and the Purchaser hereby expressly waive any and all claims and actions (other than the Escrow Agent's or such person's own acts or omissions breaching a duty owed to the claimant and amounting to gross negligence or willful misconduct as finally determined pursuant to applicable law by a governmental authority having jurisdiction) against the Escrow Agent and his designees, and their respective partners, employees, attorneys and agents, arising out of or related directly or indirectly to any and all of the foregoing acts, omissions and circumstances.

4.7.    Indemnification.  The Escrow Agent and his designees, and his respective partners, employees, attorneys and agents, shall be indemnified, reimbursed, held harmless and, at the request of the Escrow Agent, defended, by the Seller and Purchaser from and against any and all claims, liabilities, losses and expenses (including, without limitation, the reasonable disbursements, expenses and fees of their respective attorneys) that may be imposed upon, incurred by, or asserted against any of them, arising out of or related directly or indirectly to this Escrow Agreement or the Shares, except such as are occasioned by the indemnified person's own acts and omissions breaching a duty owed to the claimant under this Agreement and amounting to willful misconduct or gross negligence as finally determined pursuant to applicable law by a governmental authority having jurisdiction.

## ARTICLE 5
## TERMINATION, AMENDMENT AND WAIVER

5.1    Termination  Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Termination Date or sale of all of the Shares solely by the mutual consent of all of the parties or, if at the time of purchase of the Shares or any of the Option Shares, the NASD has inserted an "E" upon the Company's trading symbol on the OTC Electronic Bulletin Board, or if the Company's

common stock has been delisted from any exchange, if there is otherwise a default under any provision of this Agreement, or if any of the parties fail to comply with any provisions of this Agreement, including the provisions relating to the escrow of the Shares and the Purchase Price with the Escrow Agent. In such event, at the option of Purchaser, this Agreement shall be void and of no further force and effect whatsoever.

     5.2    <u>Waiver and Amendment</u>  Any term, provision, covenant, representation, warranty or condition of this Agreement may be waived, but only by a written instrument signed by the party entitled to the benefits thereof. The failure or delay of any party at any time or times to require performance of any provision hereof or to exercise its rights with respect to any provision hereof shall in no manner operate as a waiver of or affect such party's right at a later time to enforce the same. No waiver by any party of any condition, or of the breach of any term, provision, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or waiver of any other condition or of the breach of any other term, provision, covenant, representation or warranty. No modification or amendment of this Agreement shall be valid and binding unless it be in writing and signed by all parties hereto.

**ARTICLE 6**
**MISCELLANEOUS**

     6.1    <u>Entire Agreement</u>  This Agreement sets forth the entire agreement and understanding of the parties hereto with respect to the transactions contemplated hereby, and supersedes all prior agreements, arrangements and understandings related to the subject matter hereof. No understanding, promise, inducement, statement of intention, representation, warranty, covenant or condition, written or oral, express or implied, whether by statute or otherwise, has been made by any party hereto which is not embodied in this Agreement or the written statements, certificates, or other documents delivered pursuant hereto or in connection with the transactions contemplated hereby, and no party hereto shall be bound by or liable for any alleged understanding, promise, inducement, statement, representation, warranty, covenant or condition not set forth.

     6.2    <u>Notices</u>  All notices provided for in this Agreement shall be in writing signed by the party giving such notice, and delivered personally or sent by overnight courier or messenger or sent by registered or certified mail (air mail if overseas), return receipt requested, or by telex, facsimile transmission, telegram or similar means of communication. Notices shall be deemed to have been received on the date of personal delivery, telex, facsimile transmission, telegram or similar means of communication, or if sent by overnight courier or messenger, shall be deemed to have been received on the next delivery day after deposit with the courier or messenger, or if sent by certified or registered mail, return receipt requested, shall be deemed to have been received on the third business day after the date of mailing. Notices shall be sent to the addresses set forth below:

-7-

If to Seller:

Liu Shujun
2610 South C West Tower
Convention Plaza
1 Harbour Road, Wan Chai
Hong Kong
China
Fax: _____

If to Purchaser:

Moshe Y. Rudzinski
Ramat Shlomo
Jerusalem, Israel
Fax (US): 011-972-97929-228

If to Escrow Agent:

Novack Burnbaum Crystal LLP
300 East 42nd Street
New York, New York 10017
Fax:  212-986-2907

6.3  **Choice of Law and Venue**   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall together constitute one and the same instrument.  The Agreement shall be governed by the laws of the State of New York.

6.4  **Disputes**   Except as otherwise provided herein, if a dispute should arise between the parties including, but not limited to arbitration, the prevailing party shall be reimbursed by the non-prevailing party for all reasonable expenses incurred in resolving such dispute, including reasonable attorneys' fees exclusive of such amount of attorneys' fees as shall be a premium for result or for risk of loss under a contingency fee arrangement.

6.5  **Taxes**   Any income taxes required to be paid in connection with the payments due hereunder, shall be borne by the party required to make such payment.  Any withholding taxes in the nature of a tax on income shall be deducted from payments due, and the party required to withhold such tax shall furnish to the party receiving such payment all documentation necessary to prove the proper amount to withhold of such taxes and to prove payment to the tax authority of such required withholding.

-8-

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, as of the date first written herein above.

**Seller:**

_____

LIU SHUJUN

**Purchaser:**

_____

MOSHE Y. RUDZINSKI

*As to Escrow Duties Only*

**Escrow Agent:**

NOVACK BURNBAUM CRYSTAL LLP

By: _____
    Edward H. Burnbaum, Esq.

-10-

## EXHIBIT A

### NOTICE OF EXERCISE OF OPTION

(To be Executed by the Holder in order to Exercise Options)

        The undersigned hereby irrevocably elects to exercise _____ options to purchase Shares of Common Stock of American Oriental Bioengineering, Inc. according to the conditions set forth in a certain Stock Purchase Agreement dated January    , 2003, as of the date written below.

        If Shares are to be issued in the name of a person other than the undersigned, the undersigned will pay all transfer and other taxes and charges payable with respect thereto.

Date of Exercise_____

Applicable Price per Share: $
Number of Options Exercised:
Gross Purchase Price (number of shares purchased x Price per Share):_____
Signature_____

                [Print Name of Holder and Title of Signer]
Address:_____

_____

SSN or EIN:
Shares are to be registered in the following name:

Name:
Address:
Tel:

Fax:

SSN or EIN:

Shares are to be sent or delivered to the following account:

Account Name:
Address:

## SCHEDULE A

## SELLER AND NUMBER OF SECURITIES

| Seller Name | Number of Shares | Certificate Number(s) | Stock Powers |
|---|---|---|---|
| Liu Shujun | | | |

*Exhibit # 1 (a)*

## STOCK PURCHASE AGREEMENT

STOCK PURCHASE AGREEMENT, made effective as of this 22nd day of January, 2003 by and between **Moshe Y. Rudzinski** ( Purchaser ) and **Bai Cao** ( Seller ).

W I T N E S S E T H

WHEREAS, Seller desires to grant rights and options to the Purchaser, to buy up to 600,000 shares of the common stock of American Oriental Bioengineering, Inc. ("Company"), traded on the Over the Counter Electronic Bulletin Board ("OTCBB"), symbol "AOBO"( Share(s)), which have no restrictive legend whatsoever, and no restriction whatsoever on re-sale, on the terms and conditions set forth in this Stock Purchase Agreement ( Agreement ); and

WHEREAS, Purchaser desires to acquire the rights and options and buy Shares on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the promises and respective mutual agreements herein contained, it is agreed by and between the parties hereto as follows:

## ARTICLE 1
## PURCHASE AND SALE OF THE SHARES

1.1   Purchase of the Shares.   Subject to the each Minimum Purchase described below, at any time from the date of execution of this Agreement until May 31, 2003 ("Termination Date"), Purchaser shall have the option to purchase from the Seller the Shares in accordance with the purchase rights herein granted by the Seller to the Purchaser. The Shares shall be free from any and all restrictive legends whatsoever and any and all restrictions on re-sale. The first purchase shall have a minimum value of $100,000 based on the Purchase Price, as defined below ("First Minimum Purchase"). Purchaser may, at any time through the Termination Date, purchase up to 300,000 Shares prior to March 15, 2003 and 300,000 Shares after March 15, 2003 but prior to the Termination Date. Purchaser shall exercise its purchase rights by giving written notice of the exercise of its purchase rights ("Notice of Exercise") to the Escrow Agent, as defined in Section 4.1 below, in the form annexed hereto as Exhibit A.  The purchase price for each Share shall be 70% of the closing bid price of the Shares as reported on the OTCBB on the date a Notice of Exercise is given to the Escrow Agent ("Purchase Price"). The first Notice of Exercise for the First Minimum Purchase shall be given on the day prior to the Closing Date.  Each subsequent Notice of Exercise may be given at any time prior to the Termination Date in any number of shares in accordance with this Section 1.1. The Purchase Price shall be payable in accordance with the instructions to the Escrow Agent provided in paragraph 4.4.

1.2   Closing Date.   The Closing Date shall be January 22, 2003 ("Closing Date").  Each subsequent date on which Shares are purchased shall be a "Subsequent Closing Date" and shall occur on the day following the date on which the Escrow Agent receives a Notice of Exercise and payment of the Purchase Price, as set forth in Section

4.4 below.

1.3    <u>Instruments of Conveyance and Transfer</u>.  Upon each Notice of Exercise, the Escrow Agent shall deliver a certificate or certificates representing the Shares to Purchaser, without restrictive legend of any nature whatsoever, in form and substance satisfactory to Purchaser ( <u>Certificates</u> ), as shall be effective to vest in Purchasers all right, title and interest in and to all of the Shares, as set forth in Article 4 herein, along with an appropriate stock power or stock powers, with a medallion guaranteed signature of the Seller or Seller, sufficient to transfer the Certificate or Certificates into the name of the Purchaser or his designee.  The Seller shall provide any and all assurances which the Purchaser requires to assure that the Shares sold are free of any and all restrictions upon re-sale including but not limited to letters from the Company's transfer agent and the Company.  If necessary, Seller shall provide an opinion of counsel to verify that the Shares are free of any restriction upon re-sale.

## ARTICLE 2
## REPRESENTATIONS AND COVENANTS OF PURCHASER

2.1    The Purchaser hereby represents and warrants that:

(a)    The Purchaser has the full right, power and authority to enter into this Agreement and to carry out and consummate the transaction contemplated herein.  This Agreement constitutes the legal, valid and binding obligation of Purchaser.

(b)    The Purchaser acknowledges that investment in the Shares involves substantial risks and is suitable only for persons of adequate financial means who can bear the economic risk of an investment in the Shares for an indefinite period of time. Purchaser further represents that Purchaser:

(i)    is an  Accredited Investor  as defined in Regulation D promulgated under the Securities Act of 1933, as amended ("<u>Act</u>");

(ii)    is acquiring the Shares for its own account, for investment purposes only and not    with a view toward resale, assignment or distribution thereof, and no other person    has a direct or indirect, beneficial interest, in whole or in part, in such Shares;

(iii)    has such knowledge and experience in financial, tax and business matters that it    is capable of evaluating the merits and risks of an investment in the Shares;

(iv)    has been given the opportunity to ask question of and to receive answers from persons acting on the Seller' behalf concerning the terms and conditions of this transaction and also has been given the opportunity to obtain any additional information which the Seller

possesses or can acquire without unreasonable effort or expense. As a result, Purchaser is cognizant of the financial condition, capitalization, use of proceeds from this financing and the operations and financial condition of the Company, has available full information concerning their affairs and has been able to evaluate the merits and risks of the investment in the Shares; and

(v)   The funds provided for the Purchaser's purchase are either separate property, community property over which the signatory(ies) hereto has or have the right of control or are otherwise funds as to which the undersigned has the sole right of management.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

3.1   The Seller represent and warrant to the Purchaser, as of the Closing Date which is the date on which this Agreement is signed, the following:

(a)   Seller shall transfer title, in and to the Shares, to the Purchaser free and clear of any and all restrictive legends whatsoever, all liens, security interests, pledges, encumbrances, charges, restrictions, demands and claims, of any kind and nature whatsoever, whether direct or indirect or contingent.

(b)   Seller is not an "affiliate" of the Company as such term is defined in Regulation D promulgated under the Act, and have not done any act or acquired any status whereby the Shares would become "restricted" as that term is defined in Rule 144 promulgated under Regulation D of the Act.

3.2   If the Seller is a corporation ("Corporate Seller"), the Corporate Seller is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation,  with full power and authority to own, lease, use and operate their properties and to carry on their business as and where now owned, leased, used, operated and conducted.   The Corporate Seller is duly qualified to conduct business as a foreign corporation and are in good standing in every jurisdiction in which the nature of the business conducted by it makes such qualification necessary, except where such failure would not have a Material Adverse Effect.   A "Material Adverse Effect" means any material adverse effect on the operations, results of operations, properties, assets or condition (financial or otherwise) of the Corporate Seller, or on the transactions contemplated hereby or by the agreements or instruments to be entered into in connection herewith.

3.3   (a)   Each Seller has all requisite corporate power and authority to enter into and

perform his, her or its obligations under this Agreement and to consummate the transactions contemplated hereby and thereby and to issue the Shares in accordance with the terms hereof and thereof.

      (b)    The execution, delivery and performance by each Seller of this Agreement
and the transfer by each Seller of the Shares have been duly and validly authorized and no further consent or authorization of the Seller, or in the case of the Corporate Seller, its Board of Directors or shareholders are required.

      (c)    This Agreement has been duly executed and delivered by each Seller.

      (d)    This Agreement constitutes, and upon execution and delivery thereof by each
Seller, will constitute, a valid and binding agreement of each Seller enforceable against each Seller in accordance with its respective terms.

    3.5    The Shares shall be duly and validly issued and outstanding, fully paid and non-assessable, free and clear of any taxes, encumbrances, mortgages, pledges, and liens of any nature whatsoever, and charges with respect to issuance and shall not be subject to preemptive rights or similar rights of any other stockholders of the Company. Assuming the representations and warranties of the Purchaser herein are true and correct in all material respects, each of the Shares will have been issued in material compliance with all applicable U.S. federal and state securities laws.

3.6    The execution and delivery by the Seller of this Agreement did not and will not, the sale of or granting of the stock purchase rights by the Seller for the purchase of the Shares did not and will not contravene or constitute a default under or violation of (i) any provision of applicable law or regulation, (ii) the Company incorporation documents and by-laws, (iii) any agreement, judgment, injunction, order, decree or other instrument binding upon any Seller or any Seller's assets, or result in the creation or imposition of any lien on any asset of the Seller. The Seller are in compliance with and conforms to all statutes, laws, ordinances, rules, regulations, orders, restrictions and all other legal requirements of any domestic or foreign government or any instrumentality thereof having jurisdiction over the conduct of his her or its businesses or the ownership of its properties, except where such failure would not have a Material Adverse Effect.

### ARTICLE 4
### CLOSING, ESCROW AND DELIVERY OF DOCUMENTS

    4.1    <u>Appointment of Escrow Agent.</u> The Seller and the Purchaser hereby appoint Novack Burnbaum Crystal LLP, 300 East 42nd Street, New York, New York 10017 to act as Escrow Agent for purposes of this Agreement and the deliveries contemplated by this Agreement. The parties to this Agreement hereby acknowledge that

the Escrow Agent also serves as counsel to the Purchaser and will continue to act as counsel to the Purchaser in the event any dispute arises pursuant to this Agreement. Both Purchaser and Seller hereby waive any right to assert that NBC has a conflict of interest with respect to acting both as an Escrow Agent and as counsel to the Purchaser with regard to this Agreement and the transactions contemplated in this Agreement.

4.2     Escrow of Shares.  Prior to the Closing Date, the Seller shall deliver or cause to be delivered to the Escrow Agent an aggregate of 600,000 Shares of the Company, in the number and the denominations set forth on Schedule A, along with two (2) executed stock powers, signature medallion guaranteed, for *each* Certificate sufficient to transfer full title and interest to the Purchaser as required by the Company's transfer agent ("Stock Powers").  The Escrow Agent shall hold the Shares and shall deliver them or redeliver them to the Purchaser or to the Seller, as applicable, only in accordance with the terms and conditions of this Agreement.

4.3     Holding of Shares.  The Escrow Agent shall hold the Shares in certificated form and the Stock Powers at the office of the Escrow Agent until released in accordance with Section 4.4 below or upon termination of this Agreement, or resignation by the Escrow Agent of its appointment hereunder.

4.4     Release of Shares.

(a)     Upon the receipt of (i) a Notice of Exercise from the Purchaser stipulating the number of shares of Common Stock it is purchasing on such date, and the Purchase Price per share being paid by the Purchaser under the Notice of Exercise, and (ii) a wire transfer for the Purchase Price of the Shares set forth in the Notice of Exercise, the Escrow Agent shall release from the Escrow Account and transfer to the Purchaser that number of Shares of common stock stipulated in the Notice of Exercise and shall pay to the Seller or pay at the Seller' direction the Purchase Price for the Shares.  If, with regard to any such purchase the number of Shares in a Certificate is required to be split, then the Escrow Agent shall send the Certificate to the Company's transfer agent, along with the requisite Stock Power, and request that the transfer agent split the Certificate into the number of shares purchased, which Certificate shall be issued in the name of the Purchaser, and a Certificate for the balance of the Shares into the name of the Seller, which Seller Certificate shall be re-delivered to the Escrow Agent to be held in escrow until purchased by the Purchaser.  The Escrow Agent shall have irrevocable authority to transfer the Shares to the Purchaser upon the receipt of a Notice of Exercise, provided Escrow Agent receives the accompanying Purchase Price for the Shares.

(b)     The Escrow Agent shall release the Shares upon receipt, at any time, of joint written instructions from the Seller and the Purchaser directing the manner in which the return or other distribution of the Shares is to be made.

(c)  The Escrow Agent's obligation under this Agreement shall terminate on the Termination Date unless the Purchaser and any Seller or Seller who have unsold Shares pursuant to this Agreement jointly request in writing that the Escrow Agent

continue its appoint hereunder. Upon the Termination Date, the Escrow Agent shall return any unsold Shares and Stock Powers which it is holding to the Seller or Seller as set forth on <u>Schedule A.</u>

       4.5.   <u>Status of the Escrow Agent, Etc.</u> The Escrow Agent is acting under this Agreement as an escrow agent only. No term or provision of this Agreement is intended to create, nor shall any such term or provision be deemed to have created, any joint venture, partnership or attorney-client relationship between or among the Escrow Agent, the Seller and the Purchaser. The Escrow Agent's only duties are those expressly set forth in this Agreement, and each of the Seller and the Purchaser authorizes the Escrow Agent to perform those duties in accordance with its usual practices in holding property of its own or those of other escrows. The Escrow Agent may exercise or other-wise enforce any of its rights, powers, privileges, remedies and interests under this Agreement and applicable law or perform any of its duties under this Agreement by or through its partners, employees, attorneys, agents or designees.

       4.6.   <u>Exculpation.</u> The Escrow Agent and his designees, and their respective partners, employees, attorneys and agents, shall not incur any liability whatsoever for the disposition of the Shares or the taking of any other action in accordance with the terms and provisions of this Agreement, for any mistake or error in judgment, for compliance with any applicable law or any attachment, order or other directive of any court or other authority (irrespective of any conflicting term or provision of this Agreement), or for any act or omission of any other person selected with reasonable care and engaged by the Escrow Agent in connection with this Agreement (other than for such Escrow Agent's or such person's own acts or omissions breaching a duty owed to the claimant under this Agreement and amounting to willful misconduct as finally determined pursuant to applicable law by a governmental authority having jurisdiction); and each of the Seller and the Purchaser hereby waive any and all claims and actions whatsoever against the Escrow Agent and its designees, and their respective partners, employees, attorneys and agents, arising out of or related directly or indirectly to any and all of the foregoing acts, omissions and circumstances. Furthermore, the Escrow Agent and his designees, and their respective partners, employees, attorneys and agents, shall not incur any liability (other than for a person's own acts or omissions breaching a duty owed to the claimant under this Agreement and amounting to willful misconduct as finally determined pursuant to applicable law by a governmental authority having jurisdiction) for other acts and omissions arising out of or related directly or indirectly to this Agreement or the Shares; and each of the Seller and the Purchaser hereby expressly waive any and all claims and actions (other than the Escrow Agent's or such person's own acts or omissions breaching a duty owed to the claimant and amounting to gross negligence or willful misconduct as finally determined pursuant to applicable law by a governmental authority having jurisdiction) against the Escrow Agent and his designees, and their respective partners, employees, attorneys and agents, arising out of or related directly or indirectly to any and all of the foregoing acts, omissions and circumstances.

       4.7.   <u>Indemnification.</u> The Escrow Agent and his designees, and his respective partners, employees, attorneys and agents, shall be indemnified, reimbursed,

held harmless and, at the request of the Escrow Agent, defended, by the Seller and Purchaser from and against any and all claims, liabilities, losses and expenses (including, without limitation, the reasonable disbursements, expenses and fees of their respective attorneys) that may be imposed upon, incurred by, or asserted against any of them, arising out of or related directly or indirectly to this Escrow Agreement or the Shares, except such as are occasioned by the indemnified person's own acts and omissions breaching a duty owed to the claimant under this Agreement and amounting to willful misconduct or gross negligence as finally determined pursuant to applicable law by a governmental authority having jurisdiction.

## ARTICLE 5
## TERMINATION, AMENDMENT AND WAIVER

5.1    Termination    Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Termination Date or sale of all of the Shares solely by the mutual consent of all of the parties or, if at the time of purchase of the Shares or any of the Option Shares, the NASD has inserted an "E" upon the Company's trading symbol on the OTC Electronic Bulletin Board, or if the Company's common stock has been delisted from any exchange, if there is otherwise a default under any provision of this Agreement, or if any of the parties fail to comply with any provisions of this Agreement, including the provisions relating to the escrow of the Shares and the Purchase Price with the Escrow Agent.  In such event, at the option of Purchaser, this Agreement shall be void and of no further force and effect whatsoever.

5.2    Waiver and Amendment    Any term, provision, covenant, representation, warranty or condition of this Agreement may be waived, but only by a written instrument signed by the party entitled to the benefits thereof.  The failure or delay of any party at any time or times to require performance of any provision hereof or to exercise its rights with respect to any provision hereof shall in no manner operate as a waiver of or affect such party's right at a later time to enforce the same. No waiver by any party of any condition, or of the breach of any term, provision, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or waiver of any other condition or of the breach of any other term, provision, covenant, representation or warranty. No modification or amendment of this Agreement shall be valid and binding unless it be in writing and signed by all parties hereto.

## ARTICLE 6
## MISCELLANEOUS

6.1    Entire Agreement    This Agreement sets forth the entire agreement and understanding of the parties hereto with respect to the transactions contemplated hereby,

and supersedes all prior agreements, arrangements and understandings related to the subject matter hereof. No understanding, promise, inducement, statement of intention, representation, warranty, covenant or condition, written or oral, express or implied, whether by statute or otherwise, has been made by any party hereto which is not embodied in this Agreement or the written statements, certificates, or other documents delivered pursuant hereto or in connection with the transactions contemplated hereby, and no party hereto shall be bound by or liable for any alleged understanding, promise, inducement, statement, representation, warranty, covenant or condition not set forth.

      6.2    <u>Notices</u>  All notices provided for in this Agreement shall be in writing signed by the party giving such notice, and delivered personally or sent by overnight courier or messenger or sent by registered or certified mail (air mail if overseas), return receipt requested, or by telex, facsimile transmission, telegram or similar means of communication. Notices shall be deemed to have been received on the date of personal delivery, telex, facsimile transmission, telegram or similar means of communication, or if sent by overnight courier or messenger, shall be deemed to have been received on the next delivery day after deposit with the courier or messenger, or if sent by certified or registered mail, return receipt requested, shall be deemed to have been received on the third business day after the date of mailing. Notices shall be sent to the addresses set forth below:

      <u>If to Seller</u>:

      Bai Cao
      2610 South West Tower
      Convention Plaza
      1 Harbour Road, Wan Chai
      Hong Kong
      China
      Fax: 1-303-262-0603

      <u>If to Purchaser</u>:

      Moshe Y. Rudzinski
      Ramat Shlomo
      Jerusalem, Israel
      Fax (US): 011-972-97929-228

      <u>If to Escrow Agent</u>:

      Novack Burnbaum Crystal LLP
      300 East 42nd Street
      New York, New York 10017
      Fax: 212-986-2907

6.3  <u>Choice of Law and Venue</u>   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall together constitute one and the same instrument.   The Agreement shall be governed by the laws of the State of New York.

6.4  <u>Disputes</u>   Except as otherwise provided herein, if a dispute should arise between the parties including, but not limited to arbitration, the prevailing party shall be reimbursed by the non-prevailing party for all reasonable expenses incurred in resolving such dispute, including reasonable attorneys' fees exclusive of such amount of attorneys' fees as shall be a premium for result or for risk of loss under a contingency fee arrangement.

6.5  <u>Taxes</u>   Any income taxes required to be paid in connection with the payments due hereunder, shall be borne by the party required to make such payment. Any withholding taxes in the nature of a tax on income shall be deducted from payments due, and the party required to withhold such tax shall furnish to the party receiving such payment all documentation necessary to prove the proper amount to withhold of such taxes and to prove payment to the tax authority of such required withholding.

6.6  <u>Purchaser's Attorneys' Fees</u>.   Seller agrees to pay Purchaser's attorneys fees for the preparation and review of this Agreement and other transaction documents. Seller agrees that the Escrow Agent may deduct 3% of the gross amount payable upon each purchase of Shares pursuant to this Agreement on the Closing Date and each Subsequent Closing Date, and pay such amount to Purchaser's attorneys.

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

       IN WITNESS WHEREOF, the parties hereto have executed this Agreement, as of the date first written herein above.

**Seller:**

_____

BAI CAO

**Purchaser:**

_____

— 

MOSHE Y. RUDZINSKI

*As to Escrow Duties Only*

**Escrow Agent:**

NOVACK BURNBAUM CRYSTAL LLP

By:

_____

Edward H. Burnbaum, Esq.

## EXHIBIT A

### NOTICE OF EXERCISE OF OPTION

(To be Executed by the Holder in order to Exercise Options)

        The undersigned hereby irrevocably elects to exercise _____ options to purchase Shares of Common Stock of American Oriental Bioengineering, Inc. according to the conditions set forth in a certain Stock Purchase Agreement dated January    , 2003, as of the date written below.

        If Shares are to be issued in the name of a person other than the undersigned, the undersigned will pay all transfer and other taxes and charges payable with respect thereto.

        Date of Exercise_____

        Applicable Price per Share: $
        Number of Options Exercised:
        Gross Purchase Price (number of shares purchased x Price per Share):

        Signature_____

_____

                       [Print Name of Holder and Title of Signer]
        Address:_____

_____

_____

        SSN or EIN:
        Shares are to be registered in the following name:

        Name:
        Address:
        Tel:

        Fax:

        SSN or EIN:

        Shares are to be sent or delivered to the following account:

        Account Name:

Address:

## SCHEDULE A

## SELLER AND NUMBER OF SECURITIES

| Seller Name | Number of Shares | Certificate Number(s) | Stock Powers |
|---|---|---|---|
| Bai Cao | | | |

Exhibit 2

```
> > Harry
> >
> >
> > >From: "Jiang, Howard" <hjiang@dwpv.com>
> > >To: "'Harry Zhang'" <iharryzhang@hotmail.com>
> > >Subject: RE: Date: Fri, 4 Oct 2002 09:27:56 -0400
> > >
> > >Hi Harry, it's pleasure meeting you yesterday.
> > >I'll contact your friend to
> > >see if we can work together.
> > >
> > >Howard
> > >
> > >-----Original Message-----
> > >From: Harry Zhang [mailto:iharryzhang@hotmail.com]
> > >Sent: Friday, October 04, 2002 5:54 AM
> > >To: Jiang, Howard
> > >Subject:
> > >
> > >
> > >Hi, Howard,
> > >
> > >Thanks for the time yesterday, indeed. It's a good
> > chat, isn't it?
> > >
> > >I checked hihi.ob. It's an interesting company.
> > However, there is no much
> > >volume in the trading. Is it interested in
> > licensing certain bio/bio-tech
> > >IPs from U.S. companies? I am working with several
> > bio/pharmaceutical
> > >concerns passed Phase II stage. Bkys.ob is one of
> > them.
> > >
> > >You might call my friend Don Vasco at 561-213-4469.
> > He is an expert in
> > >helping public companies get the attention from the
> > investing public.
> > >
> > >Best regards,
> > >
> > >Harry Zhang
> > >
> > >_____
>
```

```
Received: from fw-ny.dwpv.com ([63.80.131.3]) by mc3-f17.law16.hotmail.com with Microsoft SMTPSVC
(5.0.2195.5600);
    Mon, 18 Nov 2002 12:44:58 -0800
Received: by fw-ny.dwpv.com; id PAA08160; Mon, 18 Nov 2002 15:42:59 -0500 (EST)
Received: from unknown(10.2.0.2) by fw-ny.dwpv.com via smap (V5.5)
    id xma008157; Mon, 18 Nov 02 15:42:29 -0500
Received: by GPV_NY_EXCH with Internet Mail Service (5.5.2653.19)
    id <TFF7CD3X>; Mon, 18 Nov 2002 15:38:30 -0500
Message-ID: <695121303215D411A8EC00508BA5594CD1408B@GPV_NY_EXCH>
From: "Jiang, Howard" <hjiang@dwpv.com>
To: "'Zhang Harry'" <iharryzhang@hotmail.com>
Cc: "'viscoidon7@yahoo.com'" <viscoidon7@yahoo.com>
Subject: RE: Re: Fwd: RE: aobo.ob & hihi.ob
Date: Mon, 18 Nov 2002 15:38:29 -0500
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2653.19)
Content-Type: text/plain;
    charset="gb2312"
Content-Transfer-Encoding: quoted-printable
Return-Path: hjiang@dwpv.com
X-OriginalArrivalTime: 18 Nov 2002 20:44:58.0553 (UTC) FILETIME=[5BCCE290:01C28F43]
```

Harry, sorry for the delay.  I was travelling overseas and just =
returned.
I'm interested in picking up where we left.

Howard H. Jiang

Davies Ward Phillips & Vineberg, LLP
625 Madison Avenue=20
New York, NY 10022
Tel:1-212-588-5552
Fax:1-212-308-0132
Email:Hjiang@DWPV.com

-----Original Message-----
From: Zhang Harry [mailto:iharryzhang@hotmail.com]
Sent: Monday, November 04, 2002 5:16 PM
To: Jiang, Howard
Subject: Fwd: Re: Fwd: RE: aobo.ob & hihi.ob




>From: donald visco <viscoidon7@yahoo.com>
>To: Harry Zhang <iharryzhang@hotmail.com>
>Subject: Re: Fwd: RE: aobo.ob & hihi.ob
>Date: Tue, 29 Oct 2002 10:48:38 -0800 (PST)
>
>Harry,
>
>Nobody called and what about aobo--e-mail Jiang no
>response--lets get to work
>
>Don
>--- Harry Zhang <iharryzhang@hotmail.com> wrote:
> > Don,
> >
> > FYI.
> >
> > Howard Jiang might call you.
> >

Page 1

# CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ('Agreement') is made and effective the March 15, 2003 by and between American Oriental Bioengineering Inc., a State of Nevada incorporated Limited Liability Company ('Owner') and Harry Haining Zhang, an American citizen whose SSN is 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 ('Recipient').

## 1. **Confidential Information**.

Owner proposes to disclose certain of its confidential and proprietary information (the 'Confidential Information') to Recipient. Confidential Information shall include, without limitation and among other things, all data, materials, products, technology, computer programs, specifications, manuals, business plans, software, marketing plans, business plans, financial information, and other information disclosed or submitted, orally, in writing, or by any other media, to Recipient by Owner, which includes but not limited to the soybean protein peptide and other products of the Owner

Confidential Information disclosed orally shall be identified as such within five (5) days of disclosure. Nothing herein shall require Owner to disclose any of its information.

## 2. **Recipient's Obligations**.

A. Recipient agrees that the Confidential Information is to be considered confidential and proprietary to Owner and Recipient shall hold the same in confidence, shall not use the Confidential Information other than for the purposes of its business with Owner, and shall disclose it only to its officers, directors, or employees with a specific need to know. Recipient will not disclose, publish or otherwise reveal any of the Confidential Information received from Owner to any other party whatsoever except with the specific prior written authorization of Owner. Nor shall the Recipient buy or sell the Owner's shares of common stocks listed in the United States based on the Confidential Information provided unless such Confidential Information has become publicly available in keeping with the relevant insider trading regulations of the United States.

B. Confidential Information furnished in tangible form shall not be duplicated by Recipient except for purposes of this Agreement. Upon the request of Owner, Recipient shall return all Confidential Information received in written or tangible form, including copies, or reproductions or other media containing such Confidential Information, within ten (10) days of such request. At Recipient's option, any documents or other media developed by the Recipient containing Confidential Information may be destroyed by Recipient. Recipient shall provide a written certificate to Owner regarding destruction within ten (10) days thereafter.

## 3. **Term**.

The obligations of Recipient herein shall be effective for a period of two (2) years from the date Owner last discloses any Confidential Information to Recipient pursuant to this Agreement. Further, the obligation not to disclose shall not be affected by bankruptcy, receivership, assignment, attachment or seizure procedures, whether initiated by or against Recipient, nor by the rejection of any agreement between Owner and Recipient, by a trustee of Recipient in bankruptcy, or by the Recipient as a debtor-in-possession or the equivalent of any of the foregoing under local law.

## 4. **Other Information**.

Recipient shall have no obligation under this Agreement with respect to Confidential Information which is or becomes publicly available without breach of this Agreement by Recipient; is rightfully received by Recipient without obligations of confidentiality; or is developed by Recipient without breach of this

Agreement; provided, however, such Confidential Information shall not be disclosed until thirty (30) days after written notice of intent to disclose is given to Owner along with the asserted grounds for disclosure.

5. **No License.**

Nothing contained herein shall be construed as granting or conferring any rights by license or otherwise in any Confidential Information. It is understood and agreed that neither party solicits any change in the organization, business practice, service or products of the other party, and that the disclosure of Confidential Information shall not be construed as evidencing any intent by a party to purchase any products or services of the other party nor as an encouragement to expend funds in development or research efforts. Confidential Information may pertain to prospective or unannounced products. Recipient agrees not to use any Confidential Information as a basis upon which to develop or have a third party develop a competing or similar product.

6. **No Publicity.**

Recipient agrees not to disclose its participation in this undertaking, the existence or terms and conditions of the Agreement, or the fact that discussions are being held with Owner.

7. **Governing Law and Equitable Relief.**

This Agreement shall be governed and construed in accordance with the laws of the United States and the State of New York and Recipient consents to the exclusive jurisdiction of the state courts and U.S. federal courts located in the City of New York for any dispute arising out of this Agreement. Recipient agrees that in the event of any breach or threatened breach by Recipient, Owner may obtain, in addition to any other legal remedies which may be available, such equitable relief as may be necessary to protect Owner against any such breach or threatened breach.

8. **Final Agreement.**

This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

9. **No Assignment.**

Recipient may not assign this Agreement or any interest herein without Owner's express prior written consent.

10. **Severability.**

If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

11. **Non-Circumvention.**

Recipient agree that neither Recipient nor Recipient's organization(s) nor your Representatives will enter into any agreement or other arrangement with any party (or third party) introduced (direct or indirectly) to you by the Owner or conduct any discussions with such party without Owner's prior written consent, for a period of one years from the date of this agreement. You also agree that if Recipient, Recipient's organization(s) or Recipient's Representatives enter into any agreement or other arrangement with any

party introduced to Recipient by the Owner directly or indirectly, that the Owner will receive compensation (to be mutually agreed, dependent upon the type of Transaction) on or prior to the closing of such Transaction.

12. **No Implied Waiver**.

Either party's failure to insist in any one or more instances upon strict performance by the other party of any of the terms of this Agreement shall not be construed as a waiver of any continuing or subsequent failure to perform or delay in performance of any term hereof.

13. **Headings**.

Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

[Owner]                                    [Recipient]


By: _____          By: _____
[Owner's                                   [Recipient's
[Signer's Title]          Signer]          [Signer's Title]          Signer]

Exhibit 4

equitylineofcredit

From :
    "Clarence Chan" <clarence_chan@bioaobo.com>

To :
    <iharryzhang@hotmail.com>

Subject :
    RE:

Date :
    Wed, 2 Apr 2003 10:13:30 -0800

    Reply  Reply All  Forward    Delete  Put in
    Folder...InboxSent MessagesDraftsTrash CanIT  Printer Friendly
    Version

-----Original Message-----
From: Clarence Chan [mailto:clarence_chan@bioaobo.com]
Sent: Wednesday, April 02, 2003 9:44 AM
To: 'Harry Zhang'
Cc: 'clarence_chan@hotmail.com'; 'aobo@biosly.com'
Subject: RE:

Dear Harry

Thanks for the reply

As what we have discussed over the phone, if your investor can help us
to arrange a equity line, we will use them and we will not shop around
for another firm who can provide us with such, that means, we will
accept your condition in the convertible debenture term sheet that we
will not raise any equity line. You need not have to prepare a term
sheet for me regarding equity line until like next week and we will
probably not using this equity line until 2 - 3 months later. So, let
concentrate to sign this CD term sheet first

I agree with you that pro rata on commission can be applied to any
amount even it is less than US$ 1.25 million

Please feel free to raise your request for warrants

I think the HSBC bank account should be better for you

Please tell me today when I can have a term sheet DULY SIGNED by your
investor and fax to us for our execution

Thanks

Clarence

-----Original Message-----
From: Harry Zhang [mailto:iharryzhang@hotmail.com]
Sent: Tuesday, April 01, 2003 5:03 AM
To: clarence_chan@bioaobo.com
Cc: clarence_chan@hotmail.com
Subject:

Clarence,

The term sheet looks fine. However, the investor may not like any equity

Page 1

equitylineofcredit

line of credit or other format of floating rate securities during the term
since they conflict directly with the floating rate convertible.

On commission letter, I believe Pro Rata should be applied to any amount,
not only the amount above $1.25 million.

Warrats for me?

Two bank accts for you to choose one:

Title: Shi Xin
Acct#: 095162269
Hongkong and Shanghai Bank
306-316 King's Road
North Point, HK

Title: China Venture Partners, Inc.
ABA#: 226070474
Acct#: 1184009847
44-43 Kissena Blvd
Flushing, NY 11355
USA

Regards,

Harry

MSN 8 with e-mail virus protection service: 2 months FREE*
http://join.msn.com/?page=features/virus

Reply   Reply All   Forward     Delete   Put in
        Folder...InboxSent MessagesDraftsTrash CanIT Previous   Next |
        Close

    MSN - More Useful Everyday
      MSN Home   |   My MSN   |   Hotmail   |   Search   |   Shopping
    |   Money    |   People & Chat

      © 2003 Microsoft Corporation. All rights reserved. TERMS OF USE
      Advertise   TRUSTe Approved Privacy Statement    GetNetWise